# UNITED STATES DISTRICT COURT

for the

Central District of California

United States of America,

v.

JASON GERBER and
JARED BANKS,

Defendants.

Case No. **19MJ05191**

**ORIGINAL**

FILED
CLERK, U.S. DISTRICT COURT
DEC - 6 2019
CENTRAL DISTRICT OF CALIFORNIA
BY                              DEPUTY

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of November 5, 2019, in the county of Los Angeles in the Central District of California, the defendant(s) violated:

| | |
|---|---|
| 18 U.S.C. § 841(a)(1) | Distribution of a Controlled Substance |

This criminal complaint is based on these facts:

*Please see attached affidavit.*

☒ Continued on the attached sheet.

_____
Complainant's signature

**VINH DO, DRUG ENFORCEMENT AGENCY TASK FORCE OFFICER**
Printed name and title

Sworn to before me and signed in my presence.

Date: 12-6-19

_____
Judge's signature

City and state: Los Angeles, California

HONORABLE FREDERICK MUMM
Printed name and title

AUSA: Kevin J. Butler

**AFFIDAVIT**

I, Vinh Do, being duly sworn, declare and state as follows:

### I. PURPOSE OF AFFIDAVIT

1. This affidavit is made in support of a criminal complaint and arrest warrants against Jason GERBER and Jared Ashley BANKS for a violation of 21 U.S.C. § 841(a)(1): Distribution of a Controlled Substance and 18 U.S.C. § 2: Aiding and Abetting.

2. This affidavit is also made in support of an application for a warrant to search a brown Samsung Galaxy Edge S6 SM-G928T cellphone, serial no. A3LSMG928T ("SUBJECT DEVICE 1") and a Samsung Galaxy S10 SM-G975U cellphone, serial no. A3LSMG975U ("SUBJECT DEVICE 2"), (together, the "SUBJECT DEVICES"), in the custody of the Los Angeles Police Department ("LAPD") as item #11 and #12 under report DR no. 1915-20123, in Los Angeles, California, as described more fully in Attachment A.

3. The requested search warrant seeks authorization to seize evidence, fruits, or instrumentalities of violations of 21 U.S.C. §§ 841(a)(1) (possession with intent to distribute and distribution of controlled substances) and 846 (conspiracy and attempt to distribute controlled substances) (the "Subject Offenses"), as described more fully in Attachment B. Attachments A and B are incorporated herein by reference.

4. The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested complaint, arrest warrant, and search warrant, and does not purport to set forth all of my knowledge of or investigation into this matter. Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only.

## II. BACKGROUND OF AFFIANT

5. I have been a Law Enforcement Officer with the LAPD since October 1999. Since October 2016, I have been assigned to the Drug Enforcement Administration ("DEA"), Southern California Drug Task Force, High Intensity Drug Trafficking Area ("HIDTA") Group 51 as a Task Force Officer. HIDTA groups investigate large-scale drug organizations operating in the Southern California area and elsewhere.

6. In the course of my law enforcement career, I have conducted numerous investigations involving criminal street gangs, narcotics trafficking, narcotics conspiracies, weapons offenses, and violent crimes. I have also received specialized training on the subjects of criminal street gangs, narcotics

trafficking, and money laundering, and I have been involved in investigations concerning the possession, manufacturing, distribution, and importation of controlled substances, as well as the methods used to finance drug transactions.

7. Based on my training, experience, and conversations with other narcotics investigators, I am familiar with drug traffickers' methods of operation including the distribution, storage, and transportation of drugs, as well as the collection of drug proceeds and methods of money laundering used to conceal the nature of the proceeds. I have received training and collaborated with other law enforcement officers regarding the unlawful importation, possession, and distribution of controlled substances. I also speak regularly with narcotics investigators at the federal, state, and local levels regarding how drug traffickers store, sell, and transport narcotics.

### III. SUMMARY OF PROBABLE CAUSE

8. On November 5, 2019, GERBER met with an LAPD Confidential Source ("CS") at GERBER's residence. The CS agreed to purchase one kilogram of cocaine and an unspecified amount of cannabis from GERBER for approximately $54,000. GERBER provided the cannabis upon the CS's arrival, but stated that another person would be bringing the cocaine to his home.

9. After waiting for about one hour, BANKS arrived, brought a package into the residence, and encouraged the CS to

examine the package. The package was vacuum sealed and taped at both ends, which resembled the packaging for a kilogram of cocaine. The CS told GERBER and BANKS that the money to pay for the narcotics was outside. GERBER and BANKS accompanied the CS outside to collect the money. Outside, uniformed LAPD officers arrived and took GERBER into custody without incident. BANKS ran away, but was captured after a short foot pursuit. The kilogram of cocaine BANKS brought was subsequently recovered from inside GERBER's residence. SUBJECT DEVICE 1 was recovered from GERBER, and SUBJECT DEVICE 2 was recovered from BANKS.

### IV. STATEMENT OF PROBABLE CAUSE

10. Based on my review of law enforcement reports, conversations with other law enforcement agents, and my own knowledge of the investigation, I am aware of the following:

#### A. CS Identifies GERBER as a Possible Drug Dealer

11. During November 2019, the CS -- working with LAPD -- made contact with GERBER whom he identified as a potential source for narcotics. The CS has provided reliable information in the past, which has been corroborated through police investigations. The information provided by the CS has resulted in the arrest of multiple individuals and the seizure of narcotics and firearms.[1] The CS negotiated to purchase one

---

[1] The CS is being paid by LAPD for his information and work and has criminal convictions for at least the following crimes:

4

kilogram of cocaine for $29,000 and a large quantity of cannabis for an additional $25,000. The CS stated that GERBER lived at 11015 Aqua Vista Street, North Hollywood, California, in a converted garage ("GERBER's Residence"). LAPD Detective Chapman obtained a California Driver's License photo of GERBER based on the CS's description of GERBER by name and address and searching the LAPD database for any past crime or arrest report. LAPD Detective Chapman then showed it to the CS. The CS indicated that the person in the photo was the person who the CS negotiated to purchase cocaine and cannabis for $54,000. The CS agreed to meet on November 5, 2019 at GERBER's Residence to make the narcotics deal.

### B. The CS Meets with GERBER to Purchase Cocaine and Cannabis

12. On November 5, 2019, the CS met with LAPD detectives and officers. The CS's vehicle was checked for weapons and contraband. No weapons or contraband was found. The CS was equipped with a covert video recording device and a one-way real time audio transmitter.

13. At approximately 3:30 PM, Detective Chapman drove the CS to the area of GERBER's residence. The CS walked inside GERBER's residence and spoke with GERBER about the purchase of one kilogram of cocaine. GERBER told the CS that he had the

---

petty theft, possession of narcotic controlled substance, and burglary.

cannabis available and showed the CS a large black duffle bag that contained cannabis. GERBER told the CS that someone would bring the kilogram of cocaine to the residence. All of the CS and GERBER's interactions are confirmed in audio and video recording captured covertly.

### C. BANKS Delivers the Kilogram of Cocaine

14. After waiting for about an hour, a white BMW 640 (with California license plate 8LHZ182) arrived at GERBER's Residence and parked in the driveway. California Department of Motor Vehicles records indicate that the registered owner of the BMW was Jared BANKS. BANKS drove the BMW and was the only occupant of the car. After the later arrest, the BMW was impounded by LAPD and the VIN number matched the BMW and VIN number on record that identified BANKS as the owner. LAPD Officer Olsen saw BANKS walk inside GERBER's residence with a black bag. Inside, BANKS told the CS that the cocaine was inside the bag BANKS was carrying. BANKS encouraged the CS to verify that the cocaine was inside the bag.

15. The CS looked inside the bag that BANKS brought into the residence and found a vacuum sealed package with tape on the ends. The package resembled how a kilogram of cocaine is package for transportation and sales. After looking at the package, the CS told BANKS and GERBER that the money was

6

outside. The CS told GERBER and BANKS to accompany the CS outside to receive payment for the cocaine and cannabis.

### D. LAPD Arrest GERBER and BANKS

16. Outside the residence, the CS called LAPD Detective Chapman and stated that the CS saw the cocaine and cannabis. The CS, GERBER, and BANKS then walked outside to the driveway area of 11015 Aqua Vista St. LAPD uniformed officers approached GERBER and BANKS as they were standing outside. LAPD Officers Kim and Alvarez detained GERBER without incident.

17. BANKS saw the uniformed LAPD officers and ran east through the backyard of 11015 Aqua Vista St. After a short foot pursuit, LAPD Detective Avila and LAPD Officer Gonzalez took BANKS into custody.

### E. LAPD Recover a Handgun and the Drugs

18. LAPD Detective Prodigalidad retraced the route that BANKS ran when he tried to run away from the LAPD Officers. Detective Prodigalidad observed a blue steel 40mm semi-automatic handgun laying on the ground in the rear yard of 11015 Aqua Vista St. Detective Prodigalidad recovered the handgun and noticed that it had fresh scratch marks, which indicated that it was just thrown on the ground. The handgun had a magazine with 10 live rounds of 40 caliber ammunition. Detective Prodigalidad obtained three DNA swabs on the handgun. California Superior Court Judge Melvin D. Sandvig (Los Angeles County Chatsworth Courthouse, Division F47) then approved a search warrant to search 11015 Aqua Vista St. During the search of 11015 Aqua Vista St. Detective Prodigalidad recovered a vacuum-sealed

package that contained a white substance that resembled cocaine on top of the bed in GERBER's residence, the same bag that the CS recognized as the bag BANKS brought. Detective Prodigalidad opened a black duffle bag on top of GERBER's residence that contained 15 clear plastic bags that contained marijuana. Inside a black bag that Officer Olson observed BANKS carry into GERBER's house was $3,000 in United States Currency and a prescription medication receipt with BANK's name.

    **F.**    **Drug Test Confirms Marijuana and Cocaine**

    19.    On November 19, 2019, the LAPD Forensic Science Division conducted a morphological and chemical analysis of the marijuana recovered from GERBER's residence and calculated the total net weight to be 6707.6 grams of cannabis.

    20.    On November 21, 2019, the LAPD Forensic Science Division conducted an analysis of the package that BANKS brought to the CS and calculated the total net weight to be 1001.5 grams (+/- 8.6 grams) of cocaine.

    **V.**    **TRAINING AND EXPERIENCE ON DRUG OFFENSES**

    21.    Based on my training and experience and familiarity with investigations into drug trafficking conducted by other law enforcement agents, I know the following:

    a.    Drug trafficking is a business that involves numerous co-conspirators, from lower-level dealers to higher-level suppliers, as well as associates to process, package, and delivers the drugs and launder the drug proceeds. Drug traffickers often travel by car, bus, train, or airplane, both

domestically and to foreign countries, in connection with their illegal activities in order to meet with co-conspirators, conduct drug transactions, and transport drugs or drug proceeds.

   b. Drug traffickers often maintain books, receipts, notes, ledgers, bank records, and other records relating to the manufacture, transportation, ordering, sale and distribution of illegal drugs.  The aforementioned records are often maintained where the drug trafficker has ready access to them, such as on their cell phones and other digital devices.

   c. Communications between people buying and selling drugs take place by telephone calls and messages, such as e-mail, text messages, and social media messaging applications, sent to and from cell phones and other digital devices.  This includes sending photos or videos of the drugs between the seller and the buyer, the negotiation of price, and discussion of whether or not participants will bring weapons to a deal.  In addition, it is common for people engaged in drug trafficking to have photos and videos on their cell phones of drugs they or others working with them possess, as they frequently send these photos to each other and others to boast about the drugs or facilitate drug sales.

   d. Drug traffickers often keep the names, addresses, and telephone numbers of their drug trafficking associates on their digital devices.  Drug traffickers often keep records of

meetings with associates, customers, and suppliers on their digital devices, including in the form of calendar entries and location data.

### VI. TRAINING AND EXPERIENCE ON DIGITAL DEVICES

22. As used herein, the term "digital devices" includes the SUBJECT DEVICES.

23. Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that the following electronic evidence, inter alia, is often retrievable from digital devices:

    a. Forensic methods may uncover electronic files or remnants of such files months or even years after the files have been downloaded, deleted, or viewed via the Internet. Normally, when a person deletes a file on a computer, the data contained in the file does not disappear; rather, the data remain on the hard drive until overwritten by new data, which may only occur after a long period of time. Similarly, files viewed on the Internet are often automatically downloaded into a temporary directory or cache that is only overwritten as they are replaced with more recently downloaded or viewed content and may also be recoverable months or years later.

    b. Digital devices often contain electronic evidence related to a crime, the device's user, or the existence of evidence in other locations, such as, how the device has been

10

used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications, and materials on the device. That evidence is often stored in logs and other artifacts that are not kept in places where the user stores files, and in places where the user may be unaware of them. For example, recoverable data can include evidence of deleted or edited files; recently used tasks and processes; online nicknames and passwords in the form of configuration data stored by the browser, e-mail, and chat programs; attachment of other devices; times the device was in use; and file creation dates and sequence.

        c. The absence of data on a digital device may be evidence of how the device was used, what it was used for, and who used it. For example, showing the absence of certain software on a device may be necessary to rebut a claim that the device was being controlled remotely by such software.

        d. Digital device users can also attempt to conceal data by using encryption, steganography, or by using misleading filenames and extensions. Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed. Law enforcement continuously develops and acquires new methods of decryption, even for devices or data that cannot currently be decrypted.

11

24. Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that it is not always possible to search devices for data during a search of the premises for a number of reasons, including the following:

a. Digital data are particularly vulnerable to inadvertent or intentional modification or destruction. Thus, often a controlled environment with specially trained personnel may be necessary to maintain the integrity of and to conduct a complete and accurate analysis of data on digital devices, which may take substantial time, particularly as to the categories of electronic evidence referenced above.

b. Digital devices capable of storing multiple gigabytes are now commonplace. As an example of the amount of data this equates to, one gigabyte can store close to 19,000 average file size (300kb) Word documents, or 614 photos with an average size of 1.5MB.

25. Other than what has been described herein, to my knowledge, the United States has not attempted to obtain this data by other means.

## VI. CONCLUSION

26. For all of the reasons described above, there is probable cause to believe that GERBER and BANKS have committed a violation of 21 U.S.C. § 841(a)(1): Distribution of a Controlled

Substance and 18 U.S.C. § 2: Aiding and Abetting. There is also probable cause that the items to be seized described in Attachment B will be found in a search of the SUBJECT DEVICES described in Attachment A.

_____
Vinh Do, Task Force Officer
Drug Enforcement Administration

Subscribed to and sworn before me this 6th day of ~~November~~ DECEMBER, 2019.

_____
UNITED STATES MAGISTRATE JUDGE